IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SCOTT JEFFERY CLARK,

                    Plaintiff,

      v.

ROCK COUNTY, WISCONSIN,
ERIC CISNEROS, CHRISTOPHER
LOCHNER, CODY ST. MICHAEL, and
PETER FALK,

               Defendants.

OPINION and ORDER

22-cv-121-jdp

---

Three cars crashed on Highway 51 in front of the residence and business of Scott Jeffery Clark. Deputies from the Rock County Sheriff's Office responded. While carrying out their duties at the scene, the deputies and other responders had several interactions with Clark, who complained about the closure of the highway, the deputies' response time, and damage to his lawn caused by a tow truck. After several interactions with law enforcement officers, Clark came out of his house with a cell phone to record the ruts in his lawn. Two deputies approached him and directed him to "Come here." Clark did not comply, but turned and ran, ignoring the deputies' commands to stop. The deputies eventually caught him and forcefully arrested him. Clark suffered minor injuries. The charges against Clark were later dropped.

Clark has sued the four arresting deputies, claiming that his arrest violated the Fourth Amendment because it was not supported by probable cause and because defendants used excessive force in effectuating it. Clark names the county as a defendant only because it is obligated to indemnify individual defendants under Wis. Stat. § 895.46.

The question here is not whether Clark's arrest was necessary or wise; that's debatable. The doctrine of qualified immunity provides the deputies who arrested Clark with a zone of

protection for reasonable errors of judgment, so the question here is whether a reasonable officer, knowing what the deputies knew, could have thought there was a lawful basis to arrest Clark using the force they applied to the task.

Clark's cell phone recording shows that Clark physically resisted arrest, and the deputies used only reasonable force in effectuating it. The justification for the arrest is closer call, but Clark's interactions with the deputies and the tow truck driver provided at least arguable probable cause to arrest Clark for disorderly conduct or obstruction of the investigation, or reasonable suspicion to support an investigatory detention. Because Clark has not pointed to a closely analogous precedential case that shows that defendants violated Clark's clearly established constitutional rights, defendants are entitled to qualified immunity. The court will grant summary judgment to defendants and close this case.

FACTS

The following facts are undisputed unless otherwise noted.

Plaintiff Scott Jeffery Clark lives on Highway 51 just north of Janesville, Wisconsin, where he also runs a small hotel. Around 3:30 p.m. on March 9, 2016, three vehicles collided on the highway in front of Clark's property.[1] One of the vehicles, a minivan, ended up on Clark's front lawn. Clark witnessed the collision and had his wife call 911. Six people were involved in the accident, including two young children. The three vehicles were inoperable.

---

[1] A security camera on Clark's house recorded video of the accident and many of the events that followed, but the silent video is of limited help because the key events that led to Clark's arrest occurred outside the camera's view. (A placeholder is at Dkt. 22, Exhibit 8; the actual video has been provided to the court.) The timestamp on the video is one hour ahead of the actual time that the events occurred.

Rock County Deputies Eric Cisneros, Christopher Lochner, Cody St. Michael, and Peter Falk were dispatched to the accident scene. Cisneros arrived first, at 3:37 p.m. He first talked to the occupants of the two vehicles that remained near the highway to determine if they needed immediate medical care and to begin obtaining information needed for his investigation. He then approached the minivan on Clark's lawn to check on those occupants, which included two screaming children.

Before Cisneros was able to communicate with the people in the van, Clark approached and attempted to provide the deputy with his version of what happened and his impression of who was at fault. Cisneros was familiar with Clark from prior police contacts. Cisneros did not engage with Clark at that time; instead, he continued tending to the scene.

Clark walked away from Cisneros but returned about six minutes later. He again attempted to tell his version of what had happened and his belief of who was at fault. (Although Clark disputes that he approached Cisneros a second time, he testified that he first approached Cisneros at around 16:37:58 (video time stamp) and then again at 16:43:15. Dkt. 22, at 68, 84 (Clark Dep.). Cisneros continued to ignore Clark. Clark was upset by this and demanded to speak to a sergeant. Cisneros continued to ignore him, and Clark walked off.

At 3:44 p.m., deputies Lochner and St. Michael arrived to assist. As those deputies walked towards the individuals involved in the accident, Clark stopped them and asked them if either was a sergeant. Neither was, so Clark asked to speak to a sergeant. Clark also voiced his concerns over their response time, asking them if they "stopped for beer and pizza." The deputies responded that they needed to deal with the investigation, and told Clark that he could speak with a sergeant after the investigation and cleanup was completed. One of the

deputies put his hands on Clark's stomach and pushed him back, to which Clark responded, "Don't put your hands on me." Clark then walked away.

An ambulance arrived at 3:58 p.m. Some of the accident victims walked towards the rear of the ambulance, where they spoke with or obtained medical care from the paramedics. Clark came up to one of the EMS personnel and asked them to hurry up so that Highway 51 could be reopened. Clark testified that he was "starting to get a little tiffed" at that point because the school bus driver would not be able to drop Clark's daughter off in front of the residence if there were no access to the highway. Clark then approached another deputy and asked how long it would take to reopen the highway, to which the deputy responded that it would "take as long as it takes," an answer that caused Clark's "level of anger [to go] up another notch."

About 15 minutes later, several tow trucks arrived. One of the drivers backed his tow truck up to the van located on Clark's lawn and began attaching the van to his truck. Clark was upset because the truck's tires made deep ruts in his lawn. Clark approached the tow truck driver and told him to move his truck onto the highway and drag or pull the van off his lawn from there. The tow truck driver laughed, said, "Yeah, right," and then continued to attach the van to his truck. Clark then moved closer so that he was "right next to" the driver and ordered him to "Get your fucking truck off my grass."

The parties dispute how loudly Clark said this, but it was loud enough to be heard by Cisneros and Lochner, who were standing nearby. Deputy Lochner stopped what he was doing, jumped over the tipped flatbed of the tow truck so he was between Clark and the driver, and pushed Clark away from the driver. Upon seeing this, the other deputies also stopped their investigatory activities and began walking towards Clark, Lochner, and the truck driver. Clark

4

then walked away and back towards his house as the deputies followed behind. As he did so, he pointed up the road and told the group, "You guys should be up there and not on my property."

Clark went inside his house. Two minutes later, he came back outside with a cell phone and walked towards the tow truck as the driver was securing the van and preparing to pull it onto the truck. Clark was making a video of the tow truck and the ruts in his lawn, narrating as he recorded. His cell phone video shows most of what happened next. (An identifying placeholder for the video is docketed at Dkt. 22, Exh. 10; the video itself has been provided to the court.)

Clark walked around the front of the tow truck, videotaping the ruts and describing the damage the truck had caused to his lawn. Although the precise distance between him and the truck is hard to determine, he appears to be within 10–20 feet of it. While narrating, Clark passed in front of the truck and moved sideways, towards the deputies, who noticed him. Cisneros and Lochner began walking quickly towards Clark and said, "Come here."[2] When he saw the deputies approaching, Clark pointed his camera at them briefly, then turned and ran.

Cisneros and Lochner ran after him. During the foot pursuit, the deputies ordered Clark to stop and stated that he was under arrest. Lochner dove to stop Clark and missed. St. Michael and Falk then joined the chase.

---

[2] Clark states in his affidavit that he heard Lochner say "phone." Clark Decl., Dkt. 25, ¶ 4.x. But at his deposition, Clark admitted that he had not actually heard any deputy say this; he was merely speculating that they were coming after his phone based on their reaction when they saw him. Clark Dep., Dkt. 22, 146:21-147:10. Neither deputy can be heard saying "phone" on the video. So, the court disregards Clark's affidavit testimony on this point. *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018) (party cannot create an issue of fact by submitting affidavit that contradicts prior deposition testimony). Clark's subjective belief that the deputies were coming to take his phone away is irrelevant to the lawfulness of his arrest.

Clark continued fleeing to the outdoor deck attached to his house. The deputies, chasing after him, told him he was under arrest and to stop. Clark kept running. Once on the deck, Clark gave his phone to his wife, who was outside on the deck and continued recording. For about six seconds during the hand-off, Clark and the deputies can't be seen on the video, but the deputies can be heard shouting at Clark to get down on the ground. The deputies then went hands-on with Clark and attempted to pull his arms behind his back to handcuff him. While the deputies were doing so, Clark kept his arms tense, struggled with the deputies, and resisted their efforts to get his arms behind his back; he also grabbed the railing of the deck. The deputies were able to get Clark down to an all-fours position, from which Clark appears to attempt to stand up.[3] The deputies were able to overcome Clark's resistance and get him to the ground, lying him on his stomach while ordering him to put his hands behind his back and stop resisting. The deputies controlled his descent; they did not shove him or body-slam him. As Clark was moved down to the ground, he bent his right arm and put it under his face.

The deputies say Clark continued to resist once he was on the ground, refusing to put his hands behind his back and continuing to pull his hands away, although this cannot be clearly seen on the video. Deputy St. Michael pressed down on the back of Clark's neck with his left hand, removed his taser with his right, and threatened to use it on Clark if he did not stop resisting. Clark then moved his right hand from beneath his face down to the vicinity of his right hip and yelled that he couldn't breathe. St. Michael then placed his right knee on

---

[3] Clark asserts that he kept his arms in front rather than putting them behind him to break his fall, not as a form of resistance. The video does not support Clark's characterization; rather, it shows Clark forcefully gripping the deck railing and then, after the deputies got him off the railing and partway to the ground, pressing up on his arms from a push up-like position. (Cell phone video at 0:49–0:53.) This is consistent with his deposition testimony, where he admitted that he "struggled" with the deputies on his deck. Clark Dep., Dkt. 22, at 150-151.

Clark's neck area as the deputies worked to handcuff Clark. Shortly thereafter, Clark stopped resisting and the deputies were able to handcuff him, using two sets of handcuffs. Immediately after Clark was handcuffed, St. Michael removed his knee and the deputies assisted Clark to his feet.

St. Michael's knee was on Clark for 55 seconds. (Video 1:03-1:58). During this time, Clark yelled "I can't breathe!" several times. Although the precise amount of force that St. Michael applied with his knee is not clear from the video, he does not appear to be using all of his weight or "pinning" Clark tightly to the ground; his left knee remained on the ground. Notably, although Clark's movement was restrained, Clark was able to turn his head so he was facing the other way and to yell. (Cell phone video at 1:11.) During this time, one of the deputies remarked, "If you're yelling, you can breathe." But Clark swears that in fact he "really could hardly breathe with the deputies' weight on my back and neck" and he was afraid he was suffocating. Clark Decl., Dkt. 25, ¶ 5k.

After the officers finished handcuffing him, they directed Clark to stand up, which he did without difficulty. He was not gasping for air or having trouble breathing. As the officers escorted him off the deck and towards their vehicle, Clark turned his head over his shoulder and spoke to his wife.

At Clark's request, he was taken to the hospital, where he received an examination and x-rays. He had some bruising on his back and shoulders and his range of motion was mildly impaired. He was taken to jail and charged with disorderly conduct and resisting an officer. Both charges were dismissed on the prosecutor's motion on March 13, 2017.

ANALYSIS

## A. Fourth Amendment Claims

Clark asserts two claims under the Fourth Amendment: (1) his arrest was not supported by probable cause; and (2) the deputies' use of force against him was excessive. Defendants seek summary judgment on the grounds that they didn't violate the Fourth Amendment, and, even if they did, they are entitled to qualified immunity. Defendants don't make any individualized arguments as to any particular deputy but argue as if all four of them engaged in the same conduct. Accordingly, the court will do the same.

### 1. False arrest

The Fourth Amendment prohibits unreasonable seizures. "Ordinarily seizures are 'reasonable' only when supported by probable cause to believe an individual has committed a crime." *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014) (citations omitted). Probable cause exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). A brief investigatory detention may be lawfully made based on a reasonable suspicion of criminal activity, a showing less than probable cause. *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *Terry v. Ohio*, 392 U.S. 1, 21–22, 30 (1968)).

Probable cause "requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true." *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056–57 (7th Cir. 2011). The existence of probable cause is determined based on state criminal law. *Jones v. Clark*, 630 F.3d 677, 684

(7th Cir. 2011) (citation omitted). But an officer assessing probable cause at the scene of a disturbance is not required to determine whether a person's conduct satisfies all of the elements of a particular statute as a judge or jury would; rather, the officer is entitled to assess the probabilities and make a reasonable judgment in light of the circumstances. *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622-24 (7th Cir. 2010). The inquiry is objective, asking whether there was probable cause that the arrestee committed *any* offense. *Gutierrez v. Kermon*, 722 F.3d 1003, 1012 n.3 (7th Cir. 2013). The arresting officer's subjective reason for seizing the plaintiff is not controlling. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[Arresting officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause").

The doctrine of qualified immunity provides an added layer of protection to law enforcement officers, allowing for reasonable mistakes in judgment. Defendants are entitled to qualified immunity on Clark's false arrest claim if "a reasonable officer could have mistakenly believed that probable cause existed." *Fleming v. Livingston County, Ill.*, 674 F.3d 874, 879-80 (7th Cir. 2012) (internal quotes omitted). This standard is often termed "arguable probable cause." *Id.* Arguable probable cause is established when "a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Id*. at 880.

Defendants say they had probable cause to arrest Clark for disorderly conduct and obstructing the investigation of the accident. Wisconsin's obstructing statute provides that "whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor." Wis. Stat.

§ 946.41(1). A suspect "obstructs" if his conduct "prevents or makes difficult the performance of the officer's duties." Wis. JI 1666.

Defendants identify a continuum of activities by Clark that they say made the performance of their duties more difficult, including demanding the attention of the deputies as they were in the midst of their scene investigation, interfering and becoming disorderly with the tow truck driver, re-approaching the tow truck a second time, running away when the deputies approached him and told him to "Come here," ignoring their commands to stop, and resisting their efforts to subdue him.

Clark contends that he was merely exercising his First Amendment rights to complain and to record evidence and that defendants have produced no evidence of actual interference. The court agrees that Clark's initial interactions with the deputies—where he voiced his opinions about the collision and his dissatisfaction with their response time—did not interfere with the deputies other than to delay them for a minute or two while they conversed with Clark. An officer can't arrest someone for obstructing merely for saying things that annoy the officer. *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (striking down as overbroad ordinance which made it a crime to "interfere" with police officer that had been interpreted to prohibit speech that "in any manner … interrupt[s]" an officer). If the deputies based the arrest solely on Clark's admittedly "cantankerous" verbal interactions with the deputies, the case would have to go to a jury. But there's more.

Clark concedes that "[r]unning away from the deputies trying to arrest him was a form of resistance to that arrest[.]" Dkt. 27, at 19. But Clark says that in this case his flight was not a crime under Wis. Stat. § 946.41(1) because the officers were not acting with "lawful authority" when they attempted to arrest him. *See State v. Ferguson*, 2009 WI 50, ¶¶ 14–17, 23,

10

317 Wis.2d 586, 767 N.W.2d 187 (affirming that lawful authority requirement is a substantive element of Wis. Stat. § 946.41, and that "a constitutional violation is an unlawful act."); *Brunner v. McKillip*, 488 F.Supp.2d 775, 784–85 (W.D. Wis. 2007)("Without lawful authority to [demand that plaintiff step outside the bar for further questioning] in the first place, [the officer] would have no probable cause to believe plaintiff was violating § 946.41(1) by ignoring his directive."). According to Clark, the deputies had no lawful authority to approach him and say "come here" because they did not have probable cause to arrest him for a crime based on his actions up to that point. The court disagrees.

The summary judgment evidence shows that the deputies had lawful authority to detain Clark at that point for two reasons.

First, the deputies had probable cause at that point to arrest Clark for disorderly conduct based on his conduct and statements toward the tow truck driver. Wisconsin's disorderly conduct statute has two elements: (1) the individual engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct; and (2) the individual's conduct occurred under circumstances where such conduct tends to cause or provoke a disturbance. *Gibbs v. Lomas*, 755 F.3d 529, 538 (7th Cir. 2014)(citing Wis. Stat. § 947.01(1)). Although Clark's confrontation with the driver occurred off-camera, Clark admits that he was aggravated about the ruts on his lawn and that he confronted the driver and told him to drag the van off his lawn from the road. He further admits that, after the driver scoffed at this demand, Clark moved in close to the driver and told him to get his "fucking truck" off Clark's lawn. Clark denies that he raised his voice, but it is undisputed that the deputies standing nearby heard Clark saying this as he stood "right next to" the tow truck driver. Given Clark's agitated state, his cantankerous interactions with the deputies leading up to that point,

11

and his having stepped closer to the driver as he swore at him, it was reasonable for the deputies to conclude that Clark's profane and arguably abusive remark could provoke a disturbance. Upon seeing and hearing Clark tell the driver to move his "fucking truck," Deputy Lochner immediately stopped what he was doing, jumped over the tipped flatbed of the tow truck, positioned himself between Clark and the driver, and pushed Clark away from the driver.

Clark says it wasn't reasonable for the deputies to believe his statements would provoke an altercation with the tow truck driver because the driver simply laughed in response to Clark's statement, "hardly a signal that fighting words have struck home." Dkt. 23, ¶ 43 (Response to Def.'s Proposed Findings of Fact). But a charge of disorderly conduct doesn't require that "a particular person was disturbed or annoyed," or even "that an actual disturbance result from the conduct of a defendant." *In re A.S.*, 2001 WI 48, ¶ 36, 243 Wis. 2d 173, 199, 626 N.W.2d 712, 723. "Instead, the court only examines whether the conduct was of the type that tends to cause or provoke a disturbance under the circumstances as they then existed." *Id*. Under the circumstances, the deputies could have reasonably concluded that Clark's act of standing right next to the driver and demanding, in profane terms, that he remove his truck, was conduct that *tended* to cause a disturbance, namely, an altercation with the driver or the intervention of bystanders (in this case, the deputies) to prevent an altercation from happening. When Clark returned a mere two minutes later and started to reapproach the tow truck, the deputies didn't need to wait to see if Clark had calmed down, but were entitled to intervene to make sure the situation didn't re-escalate. *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) ("Probable cause exists if "at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or *is*

*about to commit* an offense.") (emphasis added). The court concludes that the deputies had probable cause to arrest Clark for disorderly conduct when he returned and re-approached the tow truck. At the very least, the deputies had arguable probable cause at that point.

The second basis for Clark's detention at that point is that the facts known to the deputies warranted an investigative stop. Officers are allowed to conduct such an investigatory stop where they simply have reasonable suspicion, based on specific and articulable facts, that a crime is occurring. *United States v. Patton*, 705 F.3d 734, 737 (7th Cir. 2013). The standard is less demanding than probable cause; it requires more than an unparticularized hunch but less than a probability or substantial chance that criminal activity exists. *Id*. at 741. The facts cited in support of probable cause provided a particularized and objective basis for the officers to suspect that Clark was about to engage in more disorderly or disruptive conduct as he neared the vicinity of the tow truck, and to detain him briefly to prevent that from happening. *Humphrey v. Staszak*, 148 F.3d 719, 728 (7th Cir. 1998) ("If an officer has reasonable grounds to believe that further trouble will ensue, he need not wait for the trouble to erupt, but may take lawful steps to prevent the problem."). "When a subject of reasonable suspicion fails to comply with a lawful directive to submit to an investigative stop, and instead flees, there is probable cause to arrest the subject for obstructing an officer" under Wis. Stat. § 946.41. *State v. Conner*, 2010 WI App 145, par. 13, 330 Wis. 2d 96, 791 N.W. 2d 404. Because the deputies had lawful authority to briefly detain him to determine what his intentions were when he re-approached the tow truck, it follows that they had probable cause to arrest Clark for obstructing once he fled.

Clark hasn't identified any clearly established precedent that would have made it clear to reasonable officers confronted with these particular circumstances that they were acting

without lawful authority in attempting to detain Clark after he reapproached the tow truck, and thus in arresting him for obstructing based on his flight. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (to defeat qualified immunity in context of a warrantless arrest, existing precedent must obviously resolve whether the circumstances with which the particular officer was confronted constituted probable cause.). Clark relies primarily on *Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852 (E.D. Wis. 2015), but the facts are plainly distinguishable: the officers in that case "could not identify any reason" for stopping and frisking the plaintiff, so their initial detention was plainly without legal authority. *Id*. at 859. Clark's other authorities likewise involved officers who were plainly acting without legal authority in seizing the plaintiff. *See Thornton v. City of Macon,* 132 F.3d 1395, 1400 (11th Cir. 1998) (denying qualified immunity to officers on false arrest claim based on obstruction charge where officers "far exceeded their authority" in refusing plaintiff's request that the officers, who were at his door to address a civil dispute concerning a mattress, leave his premises and instead entered by force to retrieve the mattress); *United States v. Fuller*, 120 F. Supp. 3d 669, 682 (E.D. Mich. 2015) (excluding as poisonous fruit evidence seized from defendant after he broke free from deputy's grasp and fled, where the deputy had no lawful basis to continue to detain defendant after reviewing his identification and realizing that he was not suspect deputy was looking for).

As the *Hardy* court observed, "there is a significant gray area between arrests that are clearly unlawful and those that should clearly be lawful," and officers must retain some discretion to arrest individuals who disregard an officer's directives. *Id*. at 873. The deputies' actions in this case—even if not strictly supported by probable cause or reasonable suspicion—fall within that gray area. The officers are entitled to qualified immunity.

### 2.   Excessive force

An officer's use of force during a seizure is unreasonable if, judging from the totality of the circumstances, the officer uses greater force than was reasonably necessary to effectuate the seizure. *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016); *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). This determination is also an objective one, made from the perspective of a reasonable officer in light of the totality of the circumstances known to the officer, without regard to the officer's intent or his subjective beliefs. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472-73 (7th Cir. 2015). In assessing reasonableness, relevant factors include the seriousness and immediacy of any threat posed by the plaintiff, the severity of any suspected crime, and the extent of the plaintiff's resistance or interference with an officer's duties. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). In considering the totality of the circumstances, courts must remember that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

Clark contends that two actions by defendants were excessive: (1) putting him face down on the ground; and (2) kneeling on his "head, neck, and back." Dkt. 27, at 23.

### a.   Prone position

No reasonable jury could find the deputies were objectively unreasonable in forcing Clark down into a prone position on his deck. As Clark acknowledges, officers may use "significant force to subdue someone who is actively resisting lawful detention." *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020). As many cases have held, when a subject resists, reasonable measures include forcibly immobilizing the person on the ground. *See Catlin*

*v. City of Wheaton*, 574 F.3d 361, 366–68 (7th Cir. 2009) (concluding that tackling and putting knee on person's back is reasonable if person physically resists or flees arrest); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (concluding that restraining person in prone position is reasonable if person resists arrest); *Kim v. Ritter*, 493 F. App'x 787, 789 (7th Cir. 2012) (officer's use of knee and handcuffs to immobilize person on ground who attempted to flee from officer was "modest use of force" to prevent flight and was not excessive); *Williams v. Sirmons*, 307 F. App'x 354, 361 (11th Cir. 2009) (where deputies reasonably believed that Williams was resisting arrest and attempting to flee, they were objectively reasonable in grabbing her from behind, pulling her to the ground, and placing a knee on her back and weight on her in order to handcuff her).

Clark denies that he actively resisted the deputies but says he "submitt[ed] to his arrest and handcuffing" as soon as he got to his deck. Dkt. 27, at 30. The cell phone video shows otherwise. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (where party's version of events is shown by videotape to be "visible fiction," court may disregard it). As noted above, the video plainly shows Clark actively resisting arrest and refusing to comply with the deputies' commands to get his hands behind his back; indeed, Clark conceded at his deposition that he struggled with the deputies before they got him to the ground. And even if one were to credit Clark's contention that some of his actions were attempts to break his fall so he did not hit the deck face first, this would not have been reasonably clear to the deputies, who had to make quick judgments in a rapidly-evolving situation. In other words, "[w]hether [plaintiff] actually intended to resist does not matter. What matters is how a reasonable officer would construe the circumstances." *Dockery v. Blackburn*, 911 F.3d 458, 463 (7th Cir. 2018). Viewed from the perspective of a reasonable officer on the scene, the deputies' decision to take Clark to the

ground to gain control of him was imminently reasonable in light of Clark's flight, including evading a deputy who dove to stop him, his refusal to obey their commands, his agitated state, and his admitted and apparent physical resistance to their efforts to restrain him.

### b.  Kneeling

Clark's second claim is that the deputies used excessive force when they "kneeled on his back, head and neck" while saying "If he's yelling, he can breathe." Dkt. 27, at 24. The court begins with two preliminary observations about this claim. First, Clark has not adduced specific facts to establish who was kneeling where. Defendants acknowledge only that St. Michael "placed his knee" on Clark; on the video, it appears that his knee is across Clark's upper neck or head area. One of the other deputies may also have applied his knee to Clark's left shoulder blade area, but that is not clear, and Clark hasn't adduced any additional evidence to prove that fact. Accordingly, for purposes of deciding this motion, the court deems it undisputed that St. Michael was the only deputy who put his knee on Clark, and that he placed it against Clark's neck.

Second, Clark doesn't explain why the statement "If he's yelling, he can breathe," helps his excessive force claim. The court infers that he means to argue that the deputies harbored ill will towards him, but the statement does not necessarily support that inference, and in any case, an officer's supposed bad faith is irrelevant to the reasonableness inquiry. *Graham*, 490 U.S. at 397. "[E]vil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id*. So the court analyzes St. Michael's use of his knee, not the deputies' subjective intent.

Defendants say that St. Michael's use of his knee was justified and reasonably necessary given that Clark actively resisted arrest both before and after he was brought to the ground. Clark does not dispute that this use of force was reasonable if he was resisting, but he says he stopped resisting once he was on the ground and threatened with the taser. As evidence, he points to the video, which shows that he moved his right hand out from under his head and down to his hip after St. Michael threatened to tase him. In the video, the deputies continued to tell Clark to "stop resisting," but it is impossible to tell whether Clark was actively resisting because the deputies' bodies are blocking any view of Clark except his head. So, the court will assume that Clark stopped resisting after the taser threat.[4]

Even with this assumption, St. Michael's use of his knee to keep Clark restrained during the handcuffing process was reasonable under the circumstances. Although "[it] is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders . . . that principle depends critically on the fact that the suspect is indeed subdued." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (citations omitted). Even if Clark began complying with the deputies' commands once St. Michael threatened him with the taser, the deputies reasonably considered Clark a continued threat, given his refusals to comply with multiple commands and his forceful actions to resist the officers' efforts to take him into custody up to that point. The deputies were not required to assume that Clark would not put up any more resistance and remove their holds on him the instant he began to comply with their commands. To the contrary, given the uncertainty of the

---

[4] This is a very generous assumption. In his affidavit, Clark merely recounts what the video shows without specifically denying that he put up any resistance after the taser threat. Dkt. 25 at ¶5h.

situation and the "considerable leeway" afforded to law enforcement officers' assessments regarding the degree of force appropriate in dangerous situations, *Williams*, 797 F.3d at 473, it was reasonable for St. Michael to apply force with his knee for a brief amount of time after Clark was subdued to keep him from getting up, to maintain control of him, and to allow the other deputies to safely handcuff him. *Helmueller v. McLain*, No. 21-CV-369-JDP, 2023 WL 2707469, at *4 (W.D. Wis. Mar. 30, 2023) ("It was reasonable for McLain to consider Helmueller a threat even if he wasn't resisting at that moment, and therefore he could use some force to keep him subdued.").

Critically, the video does not suggest that St. Michael was strangling Clark with his knee, applying his full body weight, or otherwise applying significant force: Clark could obviously yell, and he was able to turn his head from one side to the other.[5] A reasonable officer in this situation could conclude that Clark could breathe notwithstanding his complaints to the contrary. In addition, St. Michael used a knee for less than a minute, removing it immediately after Clark was handcuffed. Finally, as soon as the deputies released their holds, Clark was able to stand up, speak, yell an obscenity at the deputies, and walk away. Under these circumstances, no reasonable jury could find that the force used by St. Michael to effectuate Clark's arrest was excessive.

But even if it were a closer call, the law is not clearly established that any reasonable officer in St. Michael's position would have understood that he was violating Clark's rights, so qualified immunity applies. Although Clark appears to rely on the general rule that "significant

---

[5] This is *not* to suggest that an arrestee's ability to speak is proof that he can breathe. It is simply one of several factors that support the conclusion that the amount of force employed by St. Michael was objectively reasonable under the circumstances here.

force is unreasonable after a suspect has stopped resisting," *Alicea v. Thomas*, 815 F.3d 283, 288 89 (7th Cir. 2016), that general principle is not sufficiently specific. The Supreme Court has repeatedly warned courts "not to define clearly established law at too high a level of generality" for purposes of the qualified immunity analysis. *See, e.g., Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021); *White v. Pauly*, 137 S. Ct. 548, 552 (2017). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 (2004) (per curiam) (internal quotation marks omitted). Thus, it is not enough that a rule be suggested by existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590. To defeat defendants' claim of qualified immunity, Clark must either (1) identify a closely analogous case that established a right to be free from the type of force the deputies used, or (2) show that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment. *Id*.

Clark pursues only the first approach. He relies on *Lombardo v. City of St. Louis*, 141 S. C. 2239 (2021), *Stabenow v. City of Eau Claire,* 546 F. Supp. 3d 787, 798 (W.D. Wis. 2021), and *Ards v. Anderson*, No. 16-CV-341-JDP, 2017 WL 6734189, at *12 (W.D. Wis. Dec. 29, 2017). But all of these cases were decided after March 9, 2016, so they could not have given fair notice to the deputies that their conduct was unlawful. Regardless, none is analogous. In *Stabenow*, this court held that a reasonable jury could find that the officers used excessive force on a non-resisting suspect by "slamming [plaintiff] on the hood of the trunk, throwing him to the ground, kneeling on him so he could not breathe, and pulling on his arms so hard that it felt like the officers were breaking his arms." 546 F. Supp. 3d at 795 n.1. Plainly, the multiple

20

uses of force in that case—which caused multiple injuries to Stabenow's face and mouth—were far more egregious than St. Michael's alleged act of kneeling on Clark, making it difficult for Clark to breathe, for approximately 55 seconds during the handcuffing process, and which caused no significant injury.

Clark also cites *Ards v. Anderson,* No. 16-CV-341-JDP, 2017 WL 6734189, at *12 (W.D. Wis. Dec. 29, 2017), an Eighth Amendment case, where the court held that a reasonable jury could find that defendant had no justification for pressing a plexiglass shield with enough force to cause long-term injury on the back of an unconscious inmate who had just attempted suicide. *Ards* is not squarely on point because, unlike Ards, Clark was far from unconscious:  just before St. Michaels applied his knee, Clark had fled from two deputies, ignored their commands, and actively resisted their efforts to restrain him, complying only when threatened with a taser.

Clark's third case, *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239 (2021), lends no support to Clark's claim. The Supreme Court remanded the case after finding that genuine issues of material fact precluded summary judgment on an excessive force claim against officers who allegedly placed pressure on an arrestee's back, for 15 minutes, when the arrestee was handcuffed and leg shackled. *Id*. at 2240. But on remand, the district court found the officers were entitled to qualified immunity, and the Eighth Circuit affirmed. *Lombardo v. City of St. Louis*, 38 F.4th 684, 691 (8th Cir. 2022) (pet. for cert. docketed Nov. 30, 2022).

In sum, none of the cases cited by Clark shows a clearly-established right to be free from the force exerted by the deputies under the circumstances of this case. These cases don't clearly show that the force used by the officers was unreasonable, which is generally enough for a qualified immunity defense. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (right isn't clearly established unless it was "sufficiently clear that every reasonable official would have

understood that what he is doing violates that right" (internal quotations omitted)). At most, Clark has shown that the deputies misconstrued his actions or misjudged the amount of force needed to subdue him. But "[q]ualified immunity protects officers from mistakes in judgment of this sort." *Dockery,* 911 F.3d at 469.

Defendants are entitled to summary judgment on Clark's excessive force claim.

## ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment, Dkt. 13, is GRANTED.

2.  The clerk shall enter judgment for defendants and close this case.

Entered July 19, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge